2013V01200/BAW/KOL/sc
PAUL J. FISHMAN
United States Attorney
By:   BARBARA A. WARD
      KATHLEEN O'LEARY
Assistant United States Attorneys
970 Broad Street, Suite 700
Newark, New Jersey 07102
Tel.:  973.645.2825/2841
barbara.ward@usdoj.gov

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. |
| v. | : | Civil Action No. |
| TWO BLACK RHINOCEROS (*DICEROS BICORNIS*) HORN CARVINGS, | : : | VERIFIED COMPLAINT FOR FORFEITURE *IN REM* |
| Defendants in rem. | : | |

Plaintiff the United States of America (the "Government"), by its attorney Paul J. Fishman, United States Attorney for the District of New Jersey, for its verified complaint (the "Complaint") alleges, upon information and belief, as follows:

## I.     NATURE OF THE ACTION

1.     This action is brought by the United States of America seeking forfeiture of the following property:

Two Black Rhinoceros (*Diceros bicornis*) Horn
Carvings, Listed as Lot No. 211 in the November 13,
2011 Asian & International Fine Arts Auction
Conducted by I.M. Chait Gallery / Auctioneers,
Beverly Hills, California,

(hereinafter referred to as the Defendant Property").

2.      The Defendant Property is subject to seizure and forfeiture to the United States pursuant to 19 U.S.C. § 1595a(d), as merchandise exported or sent from the United States or attempted to be exported or sent from the United States contrary to law, in that the Defendant Property is merchandise attempted to be exported and sent from the United States contrary to the provisions of the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, and its accompanying regulations, 50 C.F.R. Part 23.

3.      The Defendant Property is further subject to seizure and forfeiture to the United States pursuant to 19 U.S.C. § 1595a(d), as merchandise exported or sent from the United States or attempted to be exported or sent from the United States contrary to law, in that the Defendant Property is merchandise attempted to be exported and sent from the United States contrary to the provisions of the Lacey Act, 16 U.S.C. § 3371 *et seq.*

## II.    JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

5.      Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the District of New Jersey.

6.      The Defendant Property is currently in the custody of the United States Department of the Interior, Fish and Wildlife Service, in its Division of Law Enforcement facility in Chelsea, Massachusetts.

### III.   LEGAL BACKGROUND

**A.**   **International Trade in Endangered Species**

> ***1.***   ***The Convention on International Trade in Endangered Species Treaty ("CITES")***

7.   Since March 3, 1973, the United States has been a party to the Convention on International Trade in Endangered Species of Wild Fauna and Flora, Mar. 3, 1973, 27 U.S.T. 1087, T.I.A.S. No. 8249 (entered into force July 1, 1975) ("CITES").

8.   The purpose of the CITES treaty is to protect species that are, or may become, threatened with extinction by international trade.

9.   CITES established a system of import and export restrictions to protect these species from overexploitation through international trade.

10.   Different levels of trade regulation are provided depending on the status of the listed species and the contribution trade makes to the decline of the species.

11.   CITES lists the affected species on Appendices I, II and III to the treaty, with each appendix specifying trade controls corresponding to the threat level facing the species listed therein.

12.   Article I(a) of CITES defines "species" as "any species, subspecies, or geographically separate population thereof."

13.   Article I(b) of CITES defines "specimen" as "(i) any animal or plant, whether alive or dead; (ii) in the case of an animal:  for species included in Appendices I and II, any readily recognizable part or derivative thereof . . ."

14.     CITES operates by creating a system of permits to regulate closely the trade in listed species.  Each country that is a party to CITES must report all of the permits to the CITES Secretariat in Geneva, Switzerland every year for use in reviewing whether a species requires additional conservation measures.

15.     CITES requires each signatory country to prohibit shipments that violate CITES and to take measures to enforce CITES.

16.     CITES requires each country to implement measures that penalize CITES violations, and that provide for the confiscation of specimens imported in violation of CITES.

17.     Signatory countries may adopt domestic laws that are stricter than what CITES requires, but must at a minimum enact laws that ensure compliance with CITES.

18.     Violations of the CITES permit regulations undermine worldwide conservation efforts as well as the treaty obligations of the United States.

19.     Appendix I to CITES lists the most highly protected species.  It includes those species that are threatened with extinction or whose survival is or may be affected by trade.

20.     The importation or exportation of an Appendix I species for any purpose — including non-commercial shipment — is authorized only in exceptional circumstances.

21.     In order to trade in any species listed in Appendix I, the exporter must first obtain both a valid CITES Appendix I Export Permit from the

exporting country and a valid CITES Appendix I Import Permit from the country of import.

22.   A CITES Appendix I Export Permit can be obtained only if the CITES Scientific Authority of the exporting country has made a determination that trade in this specimen will not be detrimental to the survival of the species and that the specimen was legally acquired under the domestic laws of that country.

23.   A CITES Appendix I Import Permit can only be obtained if the CITES Scientific Authority of the importing country has made a determination that the trade in this specimen will not be detrimental to the survival of the species and that the imported specimen will not be used for commercial purposes.

24.   Appendix II of CITES includes species which are not now threatened with extinction but which still need strict regulation to monitor their level of trade.  Appendix II species can be commercially traded.  An Import Permit is not required to be issued by the country of import.  An Appendix II Export Permit is required with the finding that trade will not be detrimental to the survival of the species.

### 2.    *The Endangered Species Act*

25.    In the United States, the CITES treaty is enforced through the Endangered Species Act of 1973 (the "ESA"), 16 U.S.C. § 1531 *et seq.,* and its accompanying regulations, 50 C.F.R. Part 23.

26.    The Endangered Species Act defines "fish or wildlife" as "any member of the animal kingdom . . . and includes any part, product, egg, or offspring thereof, or the dead body or parts thereof."  16 U.S.C. § 1532(8).

27.    The ESA makes it unlawful for any person subject to the jurisdiction to the United States to import into the United States, or to export from the United States, any endangered species of fish or wildlife.  16 U.S.C. § 1538(a)(1)(A).

28.    The ESA provides that it is unlawful for anyone subject to the jurisdiction of the United States to deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of commercial activity, any endangered species.  16 U.S.C. § 1538(a)(1)(E).

29.    The ESA makes it unlawful for any person subject to the jurisdiction of the United States to engage in trade in any specimens contrary to the provisions of CITES, or to possess any specimens traded contrary to the provisions of CITES.  16 U.S.C. § 1538(c)(l).

30.    The ESA regulations provide detailed instructions regarding the need for proper CITES permits.  *See* 50 C.F.R. Part 23.  These regulations include a requirement that each importation of an Appendix I specimen be

-6-

accompanied by a valid foreign CITES Export Permit and a valid CITES Import Permit.

**B.    *The Lacey Act's Regulation of Trade in Wildlife***

31.    Under the Lacey Act, 16 U.S.C. § 3371 *et seq.*, it is unlawful to import, export, sell, acquire, or purchase fish, wildlife or plants that are taken, possessed, transported, or sold (i) in violation of U.S. or Indian law, or (ii) in interstate or foreign commerce involving any fish, wildlife, or plants taken possessed or sold in violation of State or foreign law.

32.    The Lacey Act defines "fish or wildlife" to include any "part, product, egg, or offspring thereof."  16 U.S.C. § 3371(a).

33.    Title 16, United States Code, Section 3372(d) makes it unlawful for "any person to make or to submit any false record, account, or label for, or any false identification of, any fish or wildlife which has been, or is intended to be— (1) imported, exported, transported, sold, purchased, or received from any foreign country; or (2) transported in interstate or foreign commerce."

## III.    FACTUAL ALLEGATIONS

34.    Special Agents of the U.S. Fish and Wildlife Service and other law enforcement officers have been conducting an investigation into the unlawful trafficking in and smuggling of endangered species, including rhinoceros horns, in violation of the Endangered Species Act, the Lacey Act, the customs laws, conspiracy, and other offenses, in the District of New Jersey and elsewhere.

A.   **The Black Rhinoceros**

35.   Rhinoceros are herbivore species of prehistoric origin characterized by their enormous size, leathery skin, and horns.  Rhinoceros are among the largest remaining mega-fauna on earth.  All species of rhinoceros are protected under U.S. and international law.

36.   Africa's two species of rhinoceros are the black, or hook-lipped, rhinoceros (*Diceros bicornis*) and the white, or square-lipped, rhinoceros (*Ceratotherium simum*).

37.   The black rhinoceros (*Diceros bicornis*) is among the species accorded the highest protection under CITES.  It is listed on Appendix I and has been listed in CITES since January 7, 1975.  *See* 50 C.F.R. § 23.7(a)(3); *see also* http://cites.org/eng/resources/species.html.

38.   The black rhinoceros has been designated under U.S. law as endangered.

39.   Rhinoceros horn is a highly valued and sought after commodity despite the fact that trade in it has been largely regulated since 1976.

40.   Rhinoceros horn is believed in some Asian cultures to have health benefits.  In Vietnam, in particular, there have been recent claims by some that rhinoceros horn can cure cancer.

41.   Rhinoceros horn also is believed to bring good luck and is highly sought after as ornaments.  In Chinese culture, there is a long tradition of libation cups made from rhinoceros horn dating back many centuries.

Drinking from such a cup was believed to bring good health, and such carvings are highly prized by collectors.

42.   The price of libation cups made from rhinoceros horn has increased greatly in recent years.   China and Vietnam are among the largest known markets for rhinoceros horn.   There is no significant end market in the United States.

43.   The demand for rhinoceros horn has resulted in a thriving black market.

44.   The price for rhinoceros horn on the black market in China may be as high as approximately 1,000 RMB per gram,[1] which converts to approximately $73,000 per pound.

45.   Some of the rhinoceros horn carvings that are sold at auction and represented to be antique are not antique, but in fact have been carved in recent years.

46.   Humans, the only known predator of rhinoceros, are causing most species of rhinoceros to become extinct or on the brink of extinction.

**B.    I.M. Chait Gallery**

47.   I.M. Chait Gallery / Auctioneers (hereinafter, "Chait Gallery"), located at 9330 Civic Center Drive, Beverly Hills, California, 90210, is a family-run auction house specializing in Asian Art.

48.   Chait Gallery was founded in or about 1969 and is owned and operated by "I.M. Chait," a/k/a "Isadore M. Chait," a/k/a "Izzy Chait"

---

[1] The renminbi (RMB) is the official currency of the People's Republic of China.

(hereinafter, "I.M. Chait") and his wife, Mary Ann Chait.  His adult children, Joseph Chait, Jacob Chait, and Joshua Chait, also work in the business.

49.    I.M. Chait is a U.S. citizen.

50.    According to Chait Gallery's website, I.M. Chait is a licensed auctioneer in the State of California.

51.    On Chait Gallery's website, I.M. Chait holds himself out as an expert in Asian art, appraisals, and authentication.

52.    According to USFWS records, in 2011, 2012, and 2013, Chait Gallery had a USFWS import/export license.

53.    Pursuant to federal regulation, a person holding an import/export license from USFWS is required to maintain complete and accurate records of any dealings in wildlife pursuant to such permit for five years from the date of expiration of the permit.

54.    Chait Gallery regularly holds auctions devoted to Asian Art.  Chait Gallery also accepts consignments and offers of appraisals of art and antiques.

C.    **THE NOVEMBER 13, 2011 ASIAN AND INTERNATIONAL FINE ARTS AUCTION AT I.M. CHAIT GALLERY**

55.    On or about November 13, 2011, Chait Gallery conducted an "Asian and International Fine Arts Auction" (the "November 2011 Auction").

56.    The November 2011 Auction was advertised on the internet, in the District of New Jersey and elsewhere.

57.    The November 2011 Auction was held "live" on the internet via a third-party online auction website.   In the District of New Jersey and

elsewhere, prospective purchasers could bid on an item in real time using the internet.

58.    In addition to "live" internet bidding, a person could enter a maximum bid for an item for sale in the November 2011 Auction via the third-party website.

59.    Chait Gallery also accepted bids on the November 2011 Auction items by telephone.

60.    The cover of Chait Gallery's catalog for the November 2011 auction featured a picture of the Defendant Property.

61.    In the catalog for the November 2011 Auction, the Defendant Property was listed as Lot 211, "PAIR ANTIQUE CARVED RHINO HORN VESSELS."[2]  The items were described as follows:

> Pair of superbly carved, tall and antique, Chinese rhinoceros horns; each in the form of "libation-type" vessels: each with elaborate fully openwork design of squirrels amid grape vines, leaves and clusters of fruit; and both of fine caramel-color tones;  L: 19 1/4" (each approx. along the outer curves); each on finely carved and heavy scrolling cloud-motif hardwood stands.

(*See* footnote 2, Chait Gallery online catalog for November 2011 auction).

62.    Chait Gallery listed the estimated sale price for the Defendant Property as $200,000 to $250,000.

---

[2]  The reference is to Chait Gallery's online catalog for the November 2011 Auction, which is available via the "Archive" tab on Chait Gallery's website. *See* http://www.chait.com/asp/fullCatalogue.asp?salelot=IFA1111++211+&refno=++128890&saletype= (accessed August 5, 2014).

**D.**   **The Sale of the Defendant Property**

63.   The Defendant Property was sold in the November 2011 Auction.

64.   The buyer of the Defendant Property is listed on Chait Gallery's Invoice No. RF00010424, dated November 13, 2011, as "JUN (Carson Lee) LI" with an address in Queensland, Australia.

65.   According to the invoice, Mr. Li purchased more than 30 items from the November 2011 Auction, the majority of which were listed in the invoice as vases, pottery, and carvings.

66.   The sale price for the Defendant Property — $220,000 — was the most expensive item on the invoice.

**E.**   **The Application for an Export Permit**

67.   As set forth above, an export permit for wildlife listed in Appendix I to CITES (including black rhinoceros parts), can be obtained only if the CITES Scientific Authority of the exporting country has made a determination that trade in this specimen will not be detrimental to the survival of the species and that the specimen was legally acquired under the domestic laws of that country.  (*See*, *e.g.*, paragraph 22, above).

68.   In the United States, the agency authorized to issue certain certificates authorizing export of listed wildlife is the U.S. Fish and Wildlife Service's Division of Management Authority ("USFWS-DMA" or "DMA").

69.   On or about December 10, 2011, a representative of the freight forwarding company being used by Chait Gallery in connection with the sale to Mr. Li (the "Freight Forwarder") submitted the first application to DMA for a

Pre-Convention Export permit for the items sold to Mr. Li at the November 2011 Auction (the "December 2011 Application").

70.     The December 2011 Application stated that the foreign recipient of the item to be exported was "Lee Carson" at an address in Macau.

71.     Macau is one of the two Special Administrative Regions of the People's Republic of China, the other being Hong Kong.

72.     The December 2011 Application stated that it related to the "Export of Pre-Convention, Pre-Act, or Antique Specimens (CITES, MMPA[3] and/or ESA)." The application form states that a "Pre-Convention" specimen must have been "acquired (removed from the wild or held in captivity or a controlled environment) before the date CITES applied to it." The application form defines "antique" specimens as having been manufactured or removed from the wild over 100 years ago.

73.     DMA's application form also requires that the applicant specify the scientific name for each specimen, a description of the item, and the dates of manufacture and acquisition. In response to each of these questions, the December 2011 Application stated, "see copy of invoice and description."

74.     The invoice provided with the December 2011 Application is referred to in paragraphs 64-66, above.

75.     The enclosed "description" referred to in the December 2011 Application consists of printouts from Chait Gallery's website containing the photos and full description of Lot 211 in the November 2011 Auction.

---

[3] Marine Mammal Protection Act, Pub.L. No. 92–522, 86 Stat. 1027 (1972) (codified as amended at 16 U.S.C. § 1361) (irrelevant here).

76.    The December 2011 Application indicated that the item to be exported was less than 100 years old.

77.    The December 2011 Application also contained a signed "CERTIFICATION STATEMENT" which provided, in pertinent part, that "the wildlife was not held in the course of a commercial activity."

78.    According to the records of DMA, the December 2011 Application was received by DMA on December 15, 2011.

79.    On January 3, 2012, a DMA Legal Examiner transmitted a letter by e-mail to the Freight Forwarder stating that to complete the application for an export permit, the following information had to be provided to DMA:

(a)    The scientific name (genus, species and, if applicable, subspecies) and common name;

(b)    Documentation showing the age of the specimen or a statement from a qualified appraiser attesting to its age;

(c)    A signed and dated statement that item had not been repaired or modified using any endangered species since December 28, 1973;

(d)    The date of manufacture; and

(e)    The name of the U.S. port through which the export would occur.

80.    The Freight Forwarder, in an email of January 6, 2012, stated that the port of intended export was JFK International Airport, in Queens, New York, not Boston.  Attached to the email was a statement dated January 4, 2012 on the letterhead of Chait Gallery, purportedly signed by I.M. Chait, which stated in pertinent part that:

> I further certify that the White Rhinoceros
> (*Ceratotherium Sp.*) carvings are antique and were
> carved in the early 19th Century and have not been
> modified since the original carving.
>
> You can refer to the full description of each item in
> our printed catalogues or online for further details
> and additional provenance.

81.     In a January 13, 2012 email from the Freight Forwarder to the DMA Legal Examiner, the Freight Forwarder enclosed another statement of I.M. Chait dated January 4, 2012.  The statement was on the letterhead of Chait Gallery, purportedly signed by I.M. Chait, and described eight different ivory items and the Defendant Property.  I.M. Chait stated that on January 4, 2012, he had:

> personally appraised and inspected the items, that
> they were all antique and/or pre-ban, have no
> damage, repairs and no additional materials have been
> used to repair or modify them.
>
> My qualifications as appraiser of the items in question
> are based on my expertise as a certified appraiser,
> dealer and auctioneer specializing in Chinese art and
> antiquities with over 42 years of experience.

82.     The Freight Forwarder also provided to DMA an email from Joshua Chait dated January 12, 2012.  Joshua Chait is the son of I.M. Chait and the Director of Operations of Chait Gallery.  He is a United States citizen.

83.     The January 12, 2012 email from Joshua Chait contained a long list of his father's professional memberships, clients, educational experience, and service as an expert witness in litigation.

84.     On or about January 17, 2012, DMA sent an email to the Freight Forwarder repeating the need for the appraiser to indicate the scientific name

(genus, species and, if applicable subspecies), plus the common name; the age of the specimen; a signed and dated statement that the item had not been repaired or modified using any endangered species since December 28, 1973; and the date of acquisition.

85.     A January 24, 2012 email from Joshua Chait to the Freight Forwarder was forwarded the following day by the Freight Forwarder to DMA with the forwarding message, "Please see attached regarding [CITES]."   The email from Joshua Chait stated as follows:

> Hi [first name of representative of the Freight Forwarder],
>
> You can tell them [DMA] it is our expert opinion and we came to this conclusion based on the age and origin of the carving to determine the species type.  As that was predominately the species type used for these style of carvings during those time periods.  We also consulted other experts in the field.  It is virtually impossible to determine the exact species type because of the age of the carvings and similarities to the other species types.  It is our educated guess and expert opinion based of 42 years of experience, history and research.

86.     On or about February 2, 2012, Joshua Chait sent an email directly to DMA to provide "further clarification as to how we determined the species type and age as well as I.M. Chait's credentials and qualifications and the older documents," and stating:

> My father has been specializing in Asian Art and antiquities since 1969 and is considered the foremost expert on the West Coast.  He has even been called upon for his expert testimony for the FBI, IRS, Attorney General for several states and even consults with US Customs and Fish & Wildlife Service to

determine age, material and species type of Asian art imported into the USA.

87.     Attached to Joshua Chait's February 2, 2012 email was another copy of the signed statement of I.M. Chait dated January 4, 2012 certifying that the species of the Defendant Property was "White Rhinoceros (*Ceratotherium Sp.*)." (*See* paragraph 80, above).

88.     Also attached to Joshua Chait's February 2, 2012 email was a different statement of I.M. Chait but also dated January 4, 2012.   The statement was on the letterhead of Chait Gallery, purportedly signed by I.M. Chait.  In addition to a recital of his qualifications, I.M. Chait made this further statement regarding the Defendant Property:

> I further certify that the Rhinoceros carving are Southern White Rhinoceros (Ceratotherium simum simum) based on examination under 25x magnification and personal inspection of the color, hair pattern and patina confirms this species type. This was also the typical material used during that time period.  These have not been repaired or modified in anyway and are antique (over 100 years old) also purchased in the mid 1950s and carved in the late 19th Century (1860s).

89.     On or about February 22, 2012, based on Chait's Gallery's false representations concerning species identification, DMA issued a CITES Pre-Convention Appendix II export permit authorizing the exportation of the Defendant Property and two ivory carvings.   However, because the permit omitted some of the ivory items being shipped to Mr. Li, another permit was issued on or about March 5, 2012 which authorized the export of the

Defendant Property (which Chait Gallery had represented to be carved from Pre-Convention Appendix II white rhinoceros horn) and seven ivory items.

**F.**   **Chait Gallery's Attempt to Export the Defendant Property**

90.   A USFWS Form 3-177, Declaration for Importation or Exportation of Fish or Wildlife, is required for international shipments of wildlife to or from the United States.

91.   On or about July 25, 2012, the Form 3-177 for the Defendant Property was submitted electronically by a customs broker on behalf of Chait Gallery.

92.   The Form 3-177 submitted by the customs broker on behalf of Chait Gallery stated that the goods were to be exported to "Lee Carson," at the Macau address, on or about August 3, 2012 through Boston, and listed a bonded warehouse in Peabody, Massachusetts as the location for inspection.

93.   The Form 3-177 submitted by the customs broker on behalf of Chait Gallery described the Defendant Property as "CERATOTHERIUM SIMUM SIMUM / SOUTHERN WHITE RHINOCEROS."

94.   On or about August 1, 2012, USFWS Inspectors were conducting an inspection at the premises of the Freight Forwarder in Portland, Maine, and observed, among other items, two rhino horns that had been carved from tip to base.

95.   Aware of the ongoing investigation into the unlawful trafficking in and smuggling of endangered species, including rhinoceros horns (*see*

paragraph 34, above), the inspectors contacted USFWS special agents involved in the investigation.

96.    After a preliminary investigation, USFWS decided to detain the shipment to Mr. Li for a physical inspection and further investigation.

**G.    The Administrative Detention and Forfeiture Proceedings**

97.    On or about August 9, 2012, USFWS issued a Notice of Detention Letter to Chait Gallery for the shipment containing the Defendant Property.

98.    On or about August 14, 2012, USFWS inspectors picked up the Defendant Property from the bonded warehouse in Peabody, Massachusetts (where it had been moved after the initial inspection in Portland, Maine on August 1) and transported the Defendant Property to the USFWS Office of Law Enforcement in Chelsea, Massachusetts for further inspection.

99.    On or about September 6, 2012, a Senior Forensic Scientist at the National Fish and Wildlife Forensics Laboratory examined the Defendant Property and positively identified it as carved from black rhinoceros (*Diceros bicornis*) horn.

100.   On or about October 5, 2012, a USFWS agent stated in a letter to Chait Gallery that a notice of seizure of the Defendant Property would be forthcoming.

101. On or about October 5, 2012, a special agent of the USFWS received a voicemail message from I.M. Chait, who stated, in substance, that he was not certain what species of rhinoceros horn the carvings were made from, he (Chait) knew they were 200 years old, and therefore considered antique.

I.M. Chait further stated that since the carvings were antique, the specific rhinoceros species should not matter.

102. On or about October 9, 2012, in a telephone conversation between the Special Agent and Jacob Chait, Jacob Chait stated, in substance, that the seized rhinoceros carvings were approximately 200 years old.

103. Regarding Chait Gallery's written declarations that the species was white rhinoceros, in the same telephone conversation, on or about October 9, 2012, Jacob Chait stated that he was not a biologist and that, to the best of his knowledge, the carvings were white rhinoceros.

104. In the same telephone conversation, on or about October 9, 2012, Jacob Chait further stated that they would have had to cut into the carvings to be sure of the species and that he did not know how the USFWS would have been able to determine species without cutting into the horns.

105. On or about October 22, 2012, USFWS mailed a Notice of Seizure and Proposed Forfeiture to Chait Gallery stating that USFWS was seizing the Defendant Property for violations of the ESA and explaining Chait Gallery's legal options with respect to the seizure.

106. On or about January 18, 2013, Chait Gallery filed a claim in the USFWS administrative forfeiture proceedings, stating that Chait Gallery was doing so on behalf of Jun (Carson Lee) Li as his "attorney-in-fact" pursuant to Li's authorization. Enclosed with the claim was an email from Carson Lee dated October 5, 2012, which stated in substance that Lee appointed Chait

Gallery, its employees and agents to assist as Li's representatives and act on Li's behalf in connection with the seizure of the Defendant Property.

107. On or about February 1, 2013, an attorney with the U.S. Department of the Interior sent a letter to I.M. Chait, his attorney, and Carson Li (at both the Australia and Macau addresses) notifying them that the January 18, 2013 claim was defective for several reasons.  Most pertinent here, the claim needed to be filed by the owner of the seized property.

108.  On or about February 26, 2013, "Carson Lee (Jun Li)" filed a claim with the Department of the Interior stating that he was the owner of the "Two (2) Black Rhinoceros (Diceros bicornis) horn carvings."

## IV.   FIRST CLAIM FOR FORFEITURE

109. Title 19, United States Code, Section 1595a(d) provides in pertinent part that "[m]erchandise exported or sent from the United States or attempted to be exported or sent from the United States contrary to law . . .  shall be seized and forfeited to the United States."

110.  Pursuant to 16 U.S.C. § 1538(a)(1), with respect to endangered species, it is unlawful for any person subject to the jurisdiction of the United States to —

(A)  import any such species into, or export any such species from the United States;

. . .

(E)  deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any such species;

-21-

(F)     sell or offer for sale in interstate or foreign commerce any such species, or

(G)     violate any regulation pertaining to such species or to any threatened species of fish or wildlife listed pursuant to section 1533 of this title and promulgated by the Secretary pursuant to authority provided by this chapter.

111.   The Defendant Property is subject to forfeiture pursuant to 19 U.S.C. § 1595a(d) as merchandise exported or sent from the United States or attempted to be exported or sent from the United States contrary to law, in that the Defendant Property was an endangered species and was delivered, received, carried, transported, and shipped in interstate and foreign commerce, in the course of a commercial activity, and was sold and offered for sale in interstate and foreign commerce, in violation of the Endangered Species Act, 16 U.S.C. § 1538(a)(1), and federal regulations pertaining endangered species of wildlife, 50 C.F.R. Parts 17 and 23.

## V.     SECOND CLAIM FOR FORFEITURE

112.   Title 19, United States Code, Section 1595a(d) provides in pertinent part that "[m]erchandise exported or sent from the United States or attempted to be exported or sent from the United States contrary to law  . . .  shall be seized and forfeited to the United States."

113.   Under the Lacey Act,

[i]t is unlawful for any person to make or submit any false record, account, or label for, or any false identification of, any fish, wildlife, or plant which has been, or is intended to be—

(1) imported, exported, transported, sold, purchased, or received from any foreign country; or

(2) transported in interstate or foreign commerce.

16 U.S.C. § 3372(d).

114. The Defendant Property is subject to forfeiture pursuant to 19 U.S.C. § 1595a(d) as merchandise attempted to be exported or sent from the United States contrary to law, in that Chait Gallery knowingly made and submitted a false record, account, and label for, and false identification of, wildlife, namely, the Defendant Property, which was intended to be exported from the United States, contrary to the provisions of the Lacey Act, 16 U.S.C. § 3372(d).

115. Such false records, accounts, and labels for, and false identifications of, wildlife, included, but were not limited to, the following

(a) In a written statement dated on or about January 4, 2012, which was sent to the Freight Forwarder on or about January 6, 2012, and again on or about February 2, 2012, with the knowledge and intent that such statement would be provided to USFWS-DMA in determining whether to issue certain certificates authorizing the export of the Defendant Property to Macau, Chait Gallery certified that the species of the Defendant Property was "White Rhinoceros (Ceratotherium Sp.)."

(b) In a different written statement, also dated on or about January 4, 2012, which was sent to the Freight Forwarder on or about February 2, 2012, with the knowledge and intent that such statement would be provided to USFWS-DMA in determining whether to issue certain certificates authorizing the export of the Defendant Property to Macau, Chait Gallery certified that the species of the Defendant Property was "Southern White Rhinoceros (Ceratotherium simum simum)."

(c) In a USFWS Form 3-177, Declaration for Importation of Fish or Wildlife, which is required for international shipments of wildlife to or from the United States, which Chait Gallery caused to be

submitted electronically to USFWS on or about July 25, 2012, I.M. Chait described the Defendant Property as "CERATOTHERIUM SIMUM SIMUM / SOUTHERN WHITE RHINOCEROS."

## REQUEST FOR RELIEF

WHEREFORE plaintiff, the United States of America, requests that judgment be entered in its favor and against the Defendant Property, and that process issue to enforce the forfeiture of the Defendant Property, and that all persons having an interest in the Defendant Property be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant Property to the United States of America for disposition according to law, and that this Court grant the Government such further relief as this Court may deem just and proper, together with the costs and disbursements in this action.

Dated:   Newark, New Jersey
         November 14, 2014

PAUL J. FISHMAN
UNITED STATES ATTORNEY

By:   *Baward*
      BARBARA A. WARD
      KATHLEEN O'LEARY
      Assistant United States Attorneys

-24-

**VERIFICATION**

| | | |
|---|---|---|
| STATE OF NEW JERSEY | ) | |
| COUNTY OF ESSEX | : ss.: | |
| DISTRICT OF NEW JERSEY | ) | |

Dorothy Manera, being duly sworn, deposes and says that she is a Senior Special Agent with the United States Fish and Wildlife Service; that she has read the foregoing Verified Complaint; and that the statements contained therein are true to the best of her knowledge, information, and belief.

The sources of deponent's information and the ground of her belief include official records and files of the United States, information obtained directly by the deponent, and information obtained by other law enforcement officials and representatives during an investigation of alleged violations of Titles 16, 18, and 19, United States Code.

DOROTHY MANERA
Senior Special Agent
U.S. Fish and Wildlife Service

Sworn to and subscribed before me this 3rd day of October, 2014, at Newark, New Jersey

_____
Notary Public

TREVOR LEE
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires November 4, 2014